Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
Todd Logan (SBN 305912)
tlogan@edelson.com
Brandt Silver-Korn (SBN 323530)
bsilverkorn@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DONALD NELSON, an individual, and CHEREE BIBBS, an individual, individually and on behalf of all others similarly situated, | Case No. _____ |
| *Plaintiffs,* | **CLASS ACTION COMPLAINT** |
| *v.* | **JURY DEMAND** |
| APPLE INC., a California corporation, | |
| *Defendant.* | |

Plaintiffs Donald Nelson and Cheree Bibbs, individually and on behalf of a proposed class, bring this Class Action Complaint against Apple Inc. seeking restitution, damages, an injunction, and other appropriate relief from Apple's ongoing participation in an illegal internet gambling enterprise. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and as to all other matters, upon information and belief.

## <u>INTRODUCTION</u>

1.      Over the last decade, the world's leading slot machine makers—companies like International Game Technology, Scientific Games Corporation, and Aristocrat Leisure—have teamed up with American technology companies to develop a new product line: social casinos.

2.      Social casinos are apps, playable from smartphones, tablets, and internet browsers, that make the "authentic Vegas-style[1]" experience of slot machine gambling available

---

[1]     Form F-1/A Doubledown Interactive Co., Ltd., https://sec.report/Document/0001193125-20-183157/.

1    to consumers anywhere and anytime. *See* Figure 1 (Screenshot of DoubleDown Casino

2    Gameplay). By moving their casino games directly onto the phones and computers of players,

3    and by leveraging an innocuous-sounding "free-to-play" model,[2] social casino companies, along

4    with Apple, Facebook, and Google (the "Platforms"), have found a way to smuggle slot

5    machines into the homes of consumers nationwide, twenty-four hours a day and three-hundred-

6    sixty-five days a year.

7         3.      Just like Las Vegas slot machines, social casinos allow users to purchase virtual

8    "chips" in exchange for real money, and then to gamble those chips at slot machines games in

9    hopes of winning still more chips to keep gambling. In DoubleDown Casino, for example,

10    players purchase "chip packages" costing up to $499.99. *See* Figure 2 (Screenshot of "Popular"

11    Chip Packages in DoubleDown Casino). But unlike Las Vegas slots, social casinos do not allow

12    players to cash out their chips. Instead, purchased chips and won chips alike can be used only for

13    more slot machine "spinning."

14

**Figure 1**                         **Figure 2**

25         4.      Nevertheless, like Las Vegas slots, social casinos are extraordinarily profitable

26    and highly addictive. Social casinos are so lucrative because they mix the addictive aspects of

27

28

---

[2]      This term is a misnomer. It refers to a business model by which the initial download of the game is free, but companies reap huge profits by selling "in-game" items (known generally as "in-app purchases").

traditional slot machines with the power the Platforms, including Defendant Apple, to leverage big data and social network pressures to identify, target, and exploit consumers prone to addictive behaviors.[3]

5.     Simply put, the social casino apps do not, and cannot, operate and profit at such a high level from these illegal games on their own. Their business of targeting, retaining, and collecting losses from addicted gamblers is inextricably entwined with the Platforms. Not only do the Platforms retain full control over allowing social casinos into their stores, and their distribution and promotion therein, but they also share directly in a substantial portion of the gamblers' losses, which are collected and controlled by the Platforms themselves.

6.     Because the Platforms are the centers for distribution and payment, social casinos gain a critical partner to retain high-spending users and collect player data, a trustworthy marketplace to conduct payment transactions, and the technological means to update their apps with targeted new content designed to keep addicted players spending money.

7.     Last year alone, consumers purchased and gambled away an estimated *$6 billion* in social casino virtual chips.[4]

8.     By utilizing Apple for distribution and payment processing, the social casinos entered into a mutually beneficial business partnership. In exchange for distributing the casino games, providing them valuable data and insight about their players, and collecting money from consumers, Apple (and the other Platforms) take a *30 percent* commission off of every wager, earning them billions in revenue. By comparison, the "house" at a traditional casino only takes 1 to 15 percent, while also taking on significant risk of loss in its operation. Apple's 30 percent rake, on the other hand, is guaranteed for its ability to act as a casino "host" and bankroll.

9.     The result (and intent) of this dangerous partnership is that consumers become addicted to social casino apps, maxing out their credit cards with purchases amounting to tens or even hundreds of thousands of dollars. Consumers addicted to social casinos suffer a variety of

---

[3]     *See, e.g.*, *How social casinos leverage Facebook user data to target vulnerable gamblers*, PBS NEWS HOUR, youtube.com/watch?v=FFtkFLNJZfM.

[4]     *SciPlay Net Income Skyrockets 127 Percent, as Social Gaming Embraced by Americans Sheltered at Home*, CASINO.ORG, https://www.casino.org/news/sciplay-net-income-skyrockets-127-percent-as-social-gaming-embraced.

non-financial damages ranging from depression to divorce to attempted suicide.

10.     These devastating consequences are not hypothetical or hyperbole: below are excerpts of sworn testimony from individuals describing their experiences with three different social casinos at issue in this case:

- **DoubleDown Casino:** "I was drawn to DoubleDown because I could play the same games that I played when I went to real casinos. Overall, I estimate that I have spent over $40,000 on chips in DoubleDown Casino. I am addicted to DoubleDown Casino . . . I knew being on DoubleDown Casino every day for hours was a problem, but I couldn't seem to stop. I believe that DoubleDown is taking advantage of people's addictions. *They know that gambling is addictive, and they act exactly like a physical casino that pays out money*. I feel alone and embarrassed about spending money to do something that only feeds my addiction. DoubleDown Casino consumes you, and makes you feel like you always have to go play. I feel guilty because I've spent money on DoubleDown that I've needed to pay bills or buy food." Exhibit 1, Declaration of Willa Moore [emphasis added].

- **DoubleDown Casino:** "I believe I have spent close to $25,000 on DoubleDown Casino. I would buy the chips with a credit card which I couldn't pay in-full, so there's interest on top of that too . . . I was a well-respected, active member of my community who owned my own business for 36 years. But when I retired, and my fellow started having health problems, DoubleDown Casino made me fall into the trap of escape and adrenaline rush to cope with all my other responsibilities. When I won, it was just great. When I lost, and started buying more and more chips, I felt lower than pond scum. I was sick to my stomach, felt like a total loser, *wondered about suicide* (although I would never leave my partner), could not sleep, had anxiety attacks with a rushing heart, and couldn't eat. I just couldn't understand how I could let it get so out of control. *It was as if it had a power over me that I couldn't break. I couldn't stop*." Exhibit 2, Declaration of Jan Saari [emphasis added].

- **Jackpot Party Casino:** "Overall, I believe that I have spent between $10,000-$20,000 playing Jackpot Party Casino. I was addicted to Jackpot Party Casino and I hate that . . . *This kind of loss put a huge strain on my ability to even buy food* . . . I believe Jackpot Party Casino had been taking advantage of my addiction . . . This game hurt me and the worst part was that when my husband was alive, he would say, 'You're not spending money on there are you?' and I lied. I hate that I have to live with that now." Exhibit 3, Declaration of Laura Perkinson [emphasis added].

- **Jackpot Party Casino:** "I believe that I've spent at least $30,000 on Jackpot Party Casino . . . *I am going through a divorce right now, in part because of how much money I spent on Jackpot Party* . . . Scientific Games will provide incentives to their top spenders so that they continue to spend. I have received Christmas gifts two times. They have sent me a robe, oils, phone charger, bath bombs, a blanket, and more. I know that they have sent other players flowers and candies . . . This game has changed my way of thinking and caring. I never thought I would get addicted to anything except cigarettes, but this has taken too much of my life away. I don't know how my life would be different without this game, but I know that it would be better and I know that I would be much better off financially . . . I

wish it didn't exist." Exhibit 4, Declaration of Donna Reed [emphasis added].

- **High 5 Casino:** "I have spent at least $10,000 on coins in High 5 Casino . . . I believe I am addicted to High 5 Casino . . . I have tried to quit but I believe three weeks is the longest amount of time I've ever been able to stop . . . Sometimes I feel guilty about playing High 5 Casino and spending so much money. My husband does not know I have spent money on it. *My grandkids will sometimes ask for money and I can't give it to them because I have to save it for this game*." Exhibit 5, Declaration of Aida Glover [emphasis added].

12.     Unsurprisingly, social casinos are illegal under many states' gambling laws.

13.     As the Ninth Circuit held in *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785 (9th Cir. 2018):

> In this appeal, we consider whether the virtual game platform "Big Fish Casino" constitutes illegal gambling under Washington law. Defendant–Appellee Churchill Downs, the game's owner and operator, has made millions of dollars off of Big Fish Casino. However, despite collecting millions in revenue, Churchill Downs, like Captain Renault in *Casablanca*, purports to be shocked—shocked!—to find that Big Fish Casino could constitute illegal gambling. We are not. We therefore reverse the district court and hold that because Big Fish Casino's virtual chips are a "thing of value," Big Fish Casino constitutes illegal gambling under Washington law.

14.     As an instructive example, DoubleDown Casino is illegal both in Washington and here in California (where the Platforms, including Defendant Apple, host it and collect their 30% rake). This year, consumers will purchase approximately $300 million worth of virtual casino chips in DoubleDown Casino. That $300 million will be divided up approximately as follows: $170 million to DoubleDown; $30 million to International Game Technology ("IGT") (a multinational slot machine manufacturer that licenses slot machine game IP to DoubleDown); and—as particularly relevant here—the remaining $100 million to Apple and the other Platforms (for hosting the app, driving vulnerable consumers to it, and processing the payments for those consumers' virtual chip purchases).

15.     In other words, despite knowing that DoubleDown Casino is illegal, Apple and the other Platforms continue to maintain a sizable (30%) financial interest by hosting the game, driving customers to it, and acting as the bank.

16.     As such, DoubleDown, Apple, and the other Platforms are all liable as co-

conspirators to an illegal gambling enterprise. Moreover, DoubleDown Casino is just one of more than fifty social casino apps (the "Illegal Slots") that the Platforms illegally host and profit from.

17.   Consequently, Apple and the other Platforms—alongside the Illegal Slot companies—are liable as co-conspirators to an illegal gambling conspiracy.

18.   Defendant Apple, for its part, is a direct participant in an informal association and enterprise of individuals and entities with the explicit purpose of knowingly devising and operating an online gambling scheme to exploit consumers and reap billions in profits (the "Social Casino Enterprise").

19.   This ongoing Enterprise necessarily promotes the success of each of its members: Social casino operators, like DoubleDown, need Platforms like Apple, Google, and Facebook, to access consumers, host their games, and process payments. The Platforms, for their part, need developers like DoubleDown to publish profit-driven and addictive applications on their platforms to generate massive revenue streams.

20.   Through this case, Plaintiffs seek to force Apple to stop participating in, and to return to consumers the money it has illegally profited from, the Social Casino Enterprise.

21.   Plaintiffs, on behalf of the putative Class, bring claims for damages and for injunctive relief under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), and California's Unfair Competition Law, Business and Professions Code § 17200, *et seq.* ("UCL").

## PARTIES

22.   Plaintiff Donald Nelson is a natural person and a citizen of the State of Wisconsin.

23.   Plaintiff Cheree Bibbs is a natural person and a citizen of the State of Alabama.

24.   Defendant Apple Inc. is a corporation existing under the laws of the State of California with its principal place of business located at 1 Infinite Loop, Cupertino, California 95014. Apple regularly conducts and transacts business in this District, as well as throughout the United States. Apple manufactures, markets, and sells the iPhone, among other electronic

devices, and owns and operates the Apple App Store, which comes preinstalled on every Apple device.

## JURISDICTION AND VENUE

25. Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the proposed class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

26. The Court has personal jurisdiction over Defendant because Defendant is headquartered in this District and Defendant's alleged wrongful conduct occurred in and emanated from this District.

27. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in and emanated from this District.

## GENERAL ALLEGATIONS

**I.     Social Casinos Are Illegal Slot Machines Under California Law.**

28. Slot machines have long been outlawed in California.

29. California law recognizes that a device can be an illegal slot machine without offering users the opportunity to win money.

30. In fact, if a gaming machine has the look and feel of a slot machine, accepts real money for gameplay, and rewards a winning spin with an "additional chance or right to use the slot machine or device," the device is an illegal slot machine.

31. Consequently, social casinos, as described herein, are illegal slot machines under California law.

32. California gambling law is, on this point, consistent with the laws of many other states—including Washington. In *Kater*, for example, the Ninth Circuit held that social casinos are illegal under Washington law because, while users cannot win money, social casino chips are "things of value" because they can be purchased for money, are awarded as prizes in social casino slot machines, and then can be used to allow players to keep spinning social casino slot machines. After two years of subsequent litigation, the parties in *Kater* reached a $155 million

nationwide class action settlement. The settlement was preliminarily approved and a final approval hearing is set for February 2021.[5]

33.    California aggressively regulates all forms of gambling. One reason it does so is to prevent consumers from being cheated by professional gambling operations.

34.    Because social casinos have previously operated as if they were not subject to gambling regulations, they do not comply with any of the regulations that govern the operation of slot machines.

35.    Notably, while any legitimately operated slot machine must randomize its results, social casinos do not randomize their results. Instead, social casinos tailor "wins" and "losses" in such a way as to maximize addiction (and, in turn, revenues). As the CEO of Double Down Casino once explained, "[o]ur games aren't built to be bulletproof like you'd need to be if you're a real gambling company. We can do things to make our games more [fun] that if you were an operator in Vegas you'd go to jail for, because *we change the odds just for fun*."[6]

36.    In other words, social casinos are not just illegal under California law, but they would not be legal slot machines under *any state law* as they cheat players out of a legitimately randomized slot machine experience. Not only can players never actually win money, but their financial losses are maximized by deceptive gameplay tweaks that would never be allowed in a legitimate slot machine.

## II.    Apple Hosts and Facilitates At Least Fifty Illegal Social Casinos.

37.    The Platforms, including Defendant Apple, have directly assisted in creating the unregulated market of virtual casino games from the outset of the industry.

---

[5]    Settlements in two related cases were also preliminarily approved and are likewise set for final approval in February 2021. Three more related cases are being litigated in Washington, against the owners and operators of certain social casino games. *See Wilson v. PTT, LLC*, 351 F. Supp. 3d 1325, 1337 (W.D. Wash. Dec. 14, 2018) (settled); *Wilson v. Playtika, Ltd.*, 349 F. Supp. 3d 1028, 1041 (W.D. Wash. Nov. 20, 2018) (settled); *Fife v. Sci. Games Corp.*, No. 2:18-CV-00565-RBL, 2018 WL 6620485, at *4 (W.D. Wash. Dec. 18, 2018) (in litigation); and *Wilson v. Huuuge, Inc.*, No. 3:18-cv-05276, 2018 WL 5921019 (W.D. Wash. Nov. 13, 2018) (same); *Benson v. Double Down Interactive, LLC*, 798 F. App'x 117 (9th Cir. 2020) (same).

[6]    *Gambling giant IGT buying Double Down for $500M, moving into Facebook games*, GEEK WIRE, https://www.geekwire.com/2012/gambling-giant-igt-buying-doubledown-500m-moving-facebook-games/ [emphasis added].

38.     Before gaining access to these social media platforms, the Illegal Slots used methods like loyalty cards to track data on how much gamblers spent, how frequently they played, or how often they bet. The Platform partnerships upgraded their business model to an in-app payment system and provided additional user data which skyrocketed revenue by providing them with access to a whole new market of consumers.

39.     The core marketing for the Illegal Slots is accomplished in concert with the Platforms, and their systems are inextricably linked. Double Down described this very setup in a public filing:

> Our games are distributed through several main platform providers, including Apple, Facebook, Google, and Amazon, which also provide us valuable information and data, such as the rankings of our games. Substantially all of our revenue is generated by players using those platforms. Consequently, our expansion and prospects depend on our continued relationships with these providers.
> ….
>
> We focus our marketing efforts on acquiring new players and retaining existing players. We acquire players both organically and through paid channels. Our paid marketing includes performance marketing and dynamic media buying on Facebook, Google, and other channels such as mobile ad networks. Underlying our paid marketing efforts are our data analytics that allow us to estimate the expected value of a player and adjust our user acquisition spend to a targeted payback period. Our broad capabilities in promotions allow us to tailor promotional activity around new releases, execute differentiated multi-channel campaigns, and reach players with preferred creative content.
> ….
>
> Our player retention marketing includes advertising on Facebook as well as outreach through email, push notifications, and social media posts on channels such as Facebook, Instagram, and Pinterest. Our data and analytics also inform our retention marketing efforts. Campaigns are specially designed for each channel based upon player preferences for dimensions such as time of day and creative content. We consistently monitor marketing results and return on investment, replacing ineffective marketing tactics to optimize and improve channel performance.
> ….
>
> We employ a rigorous, data-driven approach to player lifecycle management from user acquisition to ongoing engagement and monetization. We use internally-developed analytic tools to segment and target players and to optimize user acquisition spend across multiple channels.
> ….

1

> We continuously gather and analyze detailed customer play behavior and
> assess this data in relation to our judgments used for revenue recognition.[7]

2

3       40.     By moving to online platforms for marketing, distribution, and payment

4   processing, Defendant Apple entered into a mutually beneficial business partnership with the

5   Illegal Slots. In exchange for pushing and distributing the social casino apps and collecting

6   money from consumers, Apple and the other Platforms take a 30 percent commission off of

7   every in-app purchase, earning them billions in revenue.

8       41.     Prior to being published in the Apple App Store, developers must submit their app

9   for review. In this process, Apple examines whether the app violates any company policies and

10  demands that apps comply with all relevant laws within the jurisdiction where the app is

11  available. Apps may be, and often are, removed at Apple's discretion for violating its policies

12  and can be audited at any time.

13      42.     Apple closely monitors its gambling liability by responding to the changing

14  market landscape when it deems necessary. Apple likewise heavily regulates advertising in its

15  system that involves gambling, stating "Gambling, gaming, and lotteries can be tricky to manage

16  and tend to be one of the most regulated offerings on the App Store. Only include this

17  functionality if you've fully vetted your legal obligations everywhere you make your app

18  available and are prepared for extra time during the review process."[8]

19      43.     As such, Apple, and the Platforms, through their App review process, are keenly

20  aware of the illegal and deceptive nature of the Illegal Slots. Apple knew of the unlawful nature

21  of the Illegal Slots and nonetheless knowingly hosted the unlawful gambling apps and promoted

22  their success.

23      44.     Furthermore, on information and belief, in the wake of the *Kater* decision, the

24  Platforms did not remove any social casinos from their offerings and conferred with each other at

25  that time, jointly deciding that they would each continue to offer illegal social casino games.

26

27  _____

    [7]     Form F-1/A Doubledown Interactive Co., Ltd., https://sec.report/Document/0001193125-20-183157/.

28  [8]     *App Store Review Guidelines*, Apple.com, https://developer.apple.com/app-store/review/guidelines/#other-business-model-issues.

**A.  The Illegal Slots**

45.     Each of the following fifty social casinos offered by Apple (together the "Illegal Slots") is an illegal slot machine under California law.[9]

**Figure 4 – The Illegal Slots**

| # | Game Title | Apple App Store URL |
|---|---|---|
| 1 | Slotomania Vegas Casino Slots | https://apps.apple.com/US/app/id447553564?l=en |
| 2 | Jackpot Party - Casino Slots | https://apps.apple.com/US/app/id575980917?l=en |
| 3 | Cashman Casino Las Vegas Slots | https://apps.apple.com/US/app/id1123582513?l=en |
| 4 | DoubleDown - Casino Slots Game | https://apps.apple.com/US/app/id485126024?l=en |
| 5 | CashFrenzy - Slots Casino | https://apps.apple.com/US/app/id1404165333?l=en |
| 6 | House of Fun: Casino Slots 777 | https://apps.apple.com/US/app/id586634331?l=en |
| 7 | Huuuge Casino Slots Vegas 777 | https://apps.apple.com/US/app/id1028362533?l=en |
| 8 | Heart of Vegas Casino Slots | https://apps.apple.com/US/app/id785537179?l=en |
| 9 | Lightning Link Casino Slots | https://apps.apple.com/US/app/id1243005112?l=en |
| 10 | POP! Slots Live Vegas Casino | https://apps.apple.com/US/app/id1065980436?l=en |
| 11 | DoubleU Casino: Vegas Slots | https://apps.apple.com/US/app/id642727743?l=en |
| 12 | Caesars Casino: Vegas Slots | https://apps.apple.com/US/app/id603097018?l=en |
| 13 | Lotsa Slots - Vegas Casino | https://apps.apple.com/US/app/id1356045010?l=en |
| 14 | myVEGAS Slots - Casino Slots | https://apps.apple.com/US/app/id714508224?l=en |
| 15 | Gold Fish Casino Slots Games | https://apps.apple.com/US/app/id806393795?l=en |
| 16 | Wizard of Oz: Casino Slots | https://apps.apple.com/US/app/id916869395?l=en |
| 17 | Quick Hit Slots - Casino Games | https://apps.apple.com/US/app/id945621521?l=en |
| 18 | Cash Tornado Slots - Casino | https://apps.apple.com/US/app/id1480805172?l=en |
| 19 | Billionaire Casino Slots 777 | https://apps.apple.com/US/app/id1098617974?l=en |
| 20 | Game of Thrones Slots Casino | https://apps.apple.com/US/app/id1369317521?l=en |
| 21 | Hit it Rich! Lucky Vegas Slot | https://apps.apple.com/US/app/id694876905?l=en |
| 22 | my KONAMI - Real Vegas Slots | https://apps.apple.com/US/app/id1040172229?l=en |
| 23 | Jackpot World - Casino Slots | https://apps.apple.com/US/app/id1356980152?l=en |
| 24 | Scatter Slots - Slot Machines | https://apps.apple.com/US/app/id944158857?l=en |

---

[9]     For the Court's convenience, an iPad containing Apple-based versions of the Illegal Slots will be lodged with the Court as Exhibit 6. Upon request from Apple's appearing counsel, a copy of the iPad will be produced to Apple.

| 25 | Double Win Slots Casino Game | https://apps.apple.com/US/app/id1382108510?l=en |
| 26 | 88 Fortunes Slots Casino Games | https://apps.apple.com/US/app/id1091301948?l=en |
| 27 | Wynn Slots - Las Vegas Casino | https://apps.apple.com/US/app/id1323336775?l=en |
| 28 | Willy Wonka Slots Vegas Casino | https://apps.apple.com/US/app/id1074470421?l=en |
| 29 | Vegas Live Slots Casino | https://apps.apple.com/US/app/id1304885184?l=en |
| 30 | MONOPOLY Slots - Casino Games | https://apps.apple.com/US/app/id1215145992?l=en |
| 31 | Classic Casino Slots Games | https://apps.apple.com/US/app/id1116870834?l=en |
| 32 | GSN Casino: Slot Machine Games | https://apps.apple.com/US/app/id469231420?l=en |
| 33 | Rock N' Cash Casino Slots | https://apps.apple.com/US/app/id1143409775?l=en |
| 34 | Slot Machines 777 - Slots Era | https://apps.apple.com/US/app/id1133138987?l=en |
| 35 | Wild Classic Slots Casino | https://apps.apple.com/US/app/id1135852485?l=en |
| 36 | Club Vegas Slots: Casino Games | https://apps.apple.com/US/app/id1201054588?l=en |
| 37 | Ignite Classic Slots | https://apps.apple.com/US/app/id1256307081?l=en |
| 38 | Slots - Classic Vegas Casino | https://apps.apple.com/US/app/id994102781?l=en |
| 39 | Cash Mania - Casino Slots | https://apps.apple.com/US/app/id1518723506?l=en |
| 40 | Hot Shot Casino - Slots Games | https://apps.apple.com/US/app/id986110430?l=en |
| 41 | Double Hit Casino: Vegas Slots | https://apps.apple.com/US/app/id1016431735?l=en |
| 42 | Huge Win Slots! Casino Games | https://apps.apple.com/US/app/id1247414258?l=en |
| 43 | Winning Slots Las Vegas Casino | https://apps.apple.com/US/app/id1330550298?l=en |
| 44 | High 5 Casino: Home of Slots | https://apps.apple.com/US/app/id673354210?l=en |
| 45 | Tycoon Casino - Vegas Slots | https://apps.apple.com/US/app/id1437618231?l=en |
| 46 | Casino Games - Infinity Slots | https://apps.apple.com/US/app/id950710606?l=en |
| 47 | Slots DoubleDown Fort Knox | https://apps.apple.com/US/app/id1334300759?l=en |
| 48 | Golden Casino – Vegas Slots | https://apps.apple.com/US/app/id1216780424?l=en |
| 49 | Jackpotjoy Slots New 777 Games | https://apps.apple.com/US/app/id1355023074?l=en |
| 50 | Show Me Vegas Slots Casino App | https://apps.apple.com/US/app/id1172073178?l=en |

46.     Most or all of the Illegal Slots are also hosted and promoted by the other Platform members of the Social Casino Enterprise, Google and Facebook.

**B.**     **Apple's Facilitation, Promotion, and Control Over the Illegal Slots**

47.     Apple, for its part, routinely facilitates the success of social casinos by counseling the app developers through the app launch process and providing them with resources and business tools necessary to maximize their success on the Apple App Store.

48.     The Illegal Slot companies and Apple monitor the game activity and use the collected data to increase user spending. This access to data is critical for the developers: Since all payment processing occurs through third-party platforms, the Illegal Slot companies have limited access to personal user data unless players login through Apple or otherwise sign up for loyalty programs.[10]

49.     Because the Illegal Slots depend on the spending of a small targeted audience, the Illegal Slot companies and Platforms work together to target and exploit high-spending users, or "whales," as Illegal Slot companies like Double Down refer to their top spenders.[11]

50.     The data that the Illegal Slot companies and the Platforms collect on monetization necessarily contributes to the structure and success of the Social Casino Enterprise.

51.     Apple allows Illegal Slot companies to target high spending users and activate non-spending users. Apple aids in the design and direction of targeted advertising, both on and within its App Store and other related Apple platforms, all aimed at driving new customers to the Illegal Slots and retaining current gamblers

52.     Likewise, because they act as the "bank" for the Illegal Slots, the Platforms are entirely aware that some consumers spend *hundreds of thousands* on the Illegal Slots.

53.     Additionally, because the Illegal Slots are required to use Apple's payment system to process all in-game purchases, Apple collects a 30 percent service fee off of every transaction. If Apple ever discovers an illegal or fraudulent transaction in breach of its Apple's terms or policies, it can deny developers from redeeming the proceeds in its active balance.

---

[10]     Form F-1/A Doubledown Interactive Co., Ltd., https://sec.report/Document/0001193125-20-183157/.

[11]     *The Journey From a Single-App to a Multi-App Company*, https://youtu.be/PY8gh8M6T20?t=1260 (Joe Sigrist, Double Down General Manager: "We track our whales").

54.     Unfortunately, Apple used their developer tools to take advantage of users with severe gambling problems. As a result, Apple has unlawfully made billions of dollars on the backs of consumers.

**III.   California's Public Policy Against Enforcing Gambling Contracts Means Plaintiffs Must Turn to Federal Law to Recover Their Damages.**

55.     Under California's *in pari delicto* doctrine, California courts generally refuse to enforce gambling debts or to help plaintiffs recover gambling losses, except where a statute confers a right to bring such claims.

56.     California's *in pari delicto* doctrine does not bar this Court from issuing an injunction, under California law, enjoining Apple's participation in the Social Casino Enterprise.

57.     Moreover, federal law—specifically, RICO—confers upon Plaintiffs a right of action, enforceable by this Court, to recover their alleged damages from Apple.

### FACTS SPECIFIC TO PLAINTIFF DONALD NELSON

58.     Plaintiff Nelson has paid money to DoubleDown Casino, through Defendant Apple, for nearly ten years. Plaintiff Nelson is addicted to DoubleDown Casino.

59.     Plaintiff Nelson would often play DoubleDown Casino for several hours per day and spend hundreds of dollars per day.

60.     Playing DoubleDown Casino has had a devastating impact on Plaintiff Nelson's life. In total, Plaintiff Nelson has lost at least **$15,000** playing DoubleDown Casino.

61.     Playing the game and its related losses has also placed a significant strain on his personal relationships and cause him great financial hardship.

### FACTS SPECIFIC TO PLAINTIFF CHEREE BIBBS

62.     Plaintiff Bibbs has paid money to DoubleDown Casino, Jackpot Party, and Slotomania, through Defendant Apple, for at least five years. Plaintiff Bibbs is addicted to these games.

63.     Playing these games through Defendant Apple has had a negative impact on Plaintiff Bibbs's life. In total, she has lost approximately **$15,000**.

64.     Plaintiff Bibbs's addiction has put significant strain on her personal relationships,

her financial security, and her mental well-being.

## CLASS ALLEGATIONS

65.   **Class Definition**: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of themselves and a Class of similarly situated individuals, defined as follows:

> All persons in the United States who have lost money to any Illegal Slots through the Apple platform.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

66.   **Numerosity**: On information and belief, tens of thousands of consumers fall into the definition of the Class. Members of the Class can be identified through Defendant's records, discovery, and other third-party sources.

67.   **Commonality and Predominance**: There are many questions of law and fact common to Plaintiffs' and the Class's claims, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

      A.     Whether the Illegal Slots are illegal slot machines as defined by California Penal Code §330b.

      B.     Whether Apple, pursuant to California Penal Code §330.1, is liable for having the Illegal Slots in its management, possession, or control;

C.     Whether Apple, pursuant to California Penal Code §330b, is liable for profiting off of the Illegal Slots;

D.     Whether Apple should be enjoined from further participation in the Social Casino Enterprise;

E.     Whether Apple is a participant in the Social Casino Enterprise; and

F.     Whether Apple has committed illegal predicate acts under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

68.    **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Class in that Plaintiffs' and the members of the Class sustained damages arising out of Defendant's wrongful conduct.

69.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Class, as Plaintiffs and each member of the Class lost money playing the Illegal Slots. Plaintiffs also have no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

70.    **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies that Plaintiffs challenge apply and affect members of the Class uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs. The factual and legal bases of Defendant's liability to Plaintiffs and to the other members of the Class are the same.

71.     **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendant's wrongful conduct. Absent a class action, it would be difficult for the individual members of the Class to obtain effective relief from Defendant. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

72.     Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

**COUNT I**
**Cal. Business and Professions Code § 17200, *et seq.* (UCL)**
**Unlawful Business Practices**
**(Injunctive Relief Only)**

73.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

74.     Plaintiffs have suffered injury in fact and have lost money or property as a result of Apple's allegedly unlawful conduct.

75.     The Illegal Slots are illegal slot machines as defined by Cal. Penal Code 330b(d) because, among other reasons, when a player purchases and wagers virtual casino chips in the Illegal Slots, a winning spin affords the player an "additional chance or right to use" the Illegal Slots. Pursuant to Cal. Penal Code 330b(a), Defendant Apple, among other violative conduct, manufactures, repairs, owns, stores, possesses, sells, rents, leases, lets on shares, lends and gives away, transports, and expose for sale or lease, the Illegal Slots. Apple also offers to repair, sells, rents, leases, lets on shares, lends and gives away, permit the operations, placement,

maintenance, and keeping of, in places, rooms, spaces, and buildings owned, leased, or occupied, managed, or controlled by Apple, the Illegal Slots.

76. The Illegal Slots are illegal slot machines as defined by Cal. Penal Code 330.1 because, among other reasons, when a player purchases and wagers virtual casino chips in the Illegal Slots, a winning spin affords the player an "additional chance or right to use" the Illegal Slots. Pursuant to Cal. Penal Code 330.1(a), Defendant Apple, among other violative conduct, manufactures, owns, stores, keeps, possesses, sells, rents, leases, lets on shares, lends and gives away, transports, and exposes for sale and lease, the Illegal Slots. Apple also offers to sell, rent, lease, let on shares, lends and gives away and permits the operation of and permits to be placed, maintained, used, or kept in rooms, spaces, and building owned, leased, or occupied by Apple or under Apple's management and control, the Illegal Slots.

77. California's Unfair Competition Law ("UCL"), Business and Professions Code § 17203, specifically authorizes this Court to issue injunctive relief to enjoin ongoing acts of unfair competition and unlawful conduct.

78. Under the UCL, unfair competition encompasses any unlawful act, including acts made unlawful under the penal code and acts made unlawful by federal law.

79. Consequently, the UCL authorizes this Court to enjoin Apple's ongoing violations of Sections 330b and 330.1 of the California Penal, as well as violations of the federal RICO law.

80. Plaintiffs, on behalf of themselves and the Class, seek an order from the Court, enjoining Apple from further participation in the Social Casino Enterprise.

**COUNT II**
**18 U.S.C. § 1962(c) (RICO)**
**Racketeering Activities and Collection of Unlawful Debts**
**(Damages and Injunctive Relief)**

81. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

82.     At all relevant times, Apple is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because it is capable of holding, and does hold, "a legal or beneficial interest in property."

83.     Plaintiffs are each a "person," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue as they were injured in their business and/or property as a result of the Social Casino Enterprise's wrongful conduct described herein, including but not limited to Defendant Apple, the Platforms, and the Illegal Slots (1) having unlawfully taken and received money from Plaintiffs and the Class; (2) never provided Plaintiffs and members of the Class a fair and objective chance to win—they could only lose; and (3) directly and knowingly profited from, on information and belief, rigged and manipulated slot machines.

84.     Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

85.     18 U.S.C. § 1961(1) defines "racketeering activity" to include, among other things, (i) any act which is indictable under Title 18, Section 1084 of the United States Code (relating to the transmission of gambling information); and (ii) any act which is indictable under Title 18, Section 1955 of the United States Code (relating to the prohibition of illegal gambling businesses).

86.     Because illegal gambling is indictable under both Section 1084 and Section 1955 of Title 18 of the United States Code, the Social Enterprise is engaged in "racketeering activity."

87.     18 U.S.C. § 1961(6) defines "unlawful debt" as a debt "(A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof," and "(B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof."

88.     Because the Social Casino Enterprise collects debts incurred from a gambling activity in violation of California law, described herein, its profits derived from its ownership and maintenance constitute "unlawful debt" as defined in Section 1961(6).

89.     Apple violated 18 U.S.C. § 1962(c) and § 1962(d) by participating in, facilitating, or conducting the affairs of the Social Casino Enterprise through a pattern of racketeering activity composed of indictable offenses under California Penal Code § 330b and § 330.1.

90.     The affiliation between the Defendant Apple, the other Platforms, and the Illegal Slot companies constitutes a conspiracy to use an enterprise for the collection of unlawful debt in violation of 18 U.S.C. § 1962(d).

### Social Casino Enterprise

91.     RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

92.     Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

93.     The Social Casino Enterprise is an association-in-fact composed of Apple, Google, Facebook, and the Illegal Slot companies who are engaged in and whose activities affect interstate commerce, and which have affected and damaged interstate commercial activity. This Enterprise exists separately from the otherwise legitimate businesses operations of each individual participant.

94.     The pattern of racketeering activity conducted by the members of the Social Casino Enterprise is distinct from the Social Casino Enterprise itself, as each act of racketeering is a separate offense committed by an entity while the Social Casino Enterprise itself is an association-in-fact of legal entities. The Social Casino Enterprise has an informal structure of app developers and platforms with continuing functions or responsibilities.

95.     For approximately a decade, the Social Casino Enterprise has collaborated together to target and retain high-spending users in their online gambling scheme throughout the country. At the very latest, following the Ninth Circuit's March 18, 2018 holding in *Kater*, Defendant Apple and the other Platforms, on information and belief, mutually agreed to continue their Enterprise through their ongoing collection of unlawful debts, functioning as a cohesive unit with the purpose of gaining illicit gambling profits.

Structure of the Social Casino Enterprise

96.     The Social Casino Enterprise consists of dozens of Illegal Slot companies and the Platforms (Apple, Google, and Facebook). Each participant agreed to conduct and carry out the affairs and goals of the Social Casino Enterprise:

A.     The Illegal Slot companies agreed to conduct the affairs of the Social Casino Enterprise by developing, updating and operating the illegal slot machines: the "gambling devices." The Illegal Slot companies operate as the principals, forming the necessary business partnerships with Apple, Google and Facebook for the successful execution of their unlawful gambling scheme. The Illegal Slot companies fundamentally rely on the Platforms to host their games, access consumers, and collect revenue. Upon constructive notice of the unlawful nature of the virtual social gambling applications, the Illegal Slot companies agreed with all Enterprise participants to uphold their roles in the Social Casino Enterprise and to continue functioning as a single unit with the common purpose of collecting unlawful debts from online gambling activity.

B.     Apple, Google and Facebook agreed to conduct the affairs of the Social Casino Enterprise by serving as the gambling premises, hosting the virtual social gambling applications and processing all in-app transactions in exchange for a share in the gamblers' losses. Additionally, upon notice of the unlawful nature of the virtual social gambling applications, Apple, Google, and Facebook agreed with all participants to uphold their roles in the Social Casino Enterprise and to continue functioning as a single unit with the common purpose of collecting unlawful debts from online gambling activity.

97.     At all relevant times, each Social Casino Enterprise participant was aware of the conduct of the Social Casino Enterprise, was a knowing and willing participant in that conduct, and reaped profits from that conduct through in-app sales.

98.     The persons engaged in the Social Casino Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities.

99.     All members of the Social Casino Enterprise coordinate and maintain their respective roles in order to enrich themselves and to further the common interests of the whole.

100.     Each Social Casino Enterprise participant participated in the operation and management of the Social Casino Enterprise by directing its affairs as described herein.

101.     The wrongful conduct of the Social Casino Enterprise has been and remains part of the Social Casino Enterprise's ongoing way of doing business and constitutes a continuing threat to the Plaintiffs' and the Class's property. Without the repeated illegal acts and intentional coordination between all participants, the Social Casino Enterprise's scheme would not have succeeded and would not pose a threat to Plaintiffs and the Class into the future.

<u>Pattern of Racketeering Activity</u>

102.     The affairs of the Social Casino Enterprise were conducted in such a way to form a pattern of racketeering activity. The Social Casino Enterprise's general pattern of activity consists of designing and operating illegal internet-based slot machines and repeatedly violating public policy against gambling by:

    A.  Developing illegal slot machine games and disguising them as innocuous video game entertainment;

    B.  Distributing and operating illegal slot machine games that are, on information and belief, rigged and manipulated;

    C.  Concealing the scope and deceptive nature of their gambling applications despite knowledge of their predatory design and business model;

    D.  Providing a host platform to house unlicensed gambling activity;

    E.  Injuring the public interest by continuously advertising to and soliciting the general public to play illegal slot machines;

F.   Conspiring to uphold the Social Casino Enterprise; and

G.   Unjustly collecting unlawful debts and retaining the profits from their illegal social gambling applications.

103.   The Social Casino Enterprise has operated as a continuous unit since at least 2010.

104.   Pursuant to and in furtherance of their fraudulent scheme, Apple committed multiple predicate act violations of California law as previously alleged herein, including violations of California Penal Code Sections 330b and 330.1.

**COUNT III**
**RICO § 1962(d)**
**Conspiracy to Engage in Racketeering Activities and Collection of Unlawful Debts**
**(Damages and Injunctive Relief)**

105.   Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

106.   18 U.S.C. § 1962(d) states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

107.   As described throughout, and in detail in Count II, even if it did not direct or manage the affairs of the Social Casino Enterprise, Apple conspired to commit predicate acts in violation of § 1962(c), including violations of California Penal Code §§ 330b and 330.1.

108.   Defendant Apple acted knowingly at all times when agreeing to conduct the activities of the Social Casino Enterprise. Apple agreed to and indeed did participate in the requisite pattern of racketeering activity which constitutes this RICO claim, collected unlawful debts, engaged in racketeering activities, and intentionally acted in furtherance of the conspiracy by conducting the pattern of racketeering and unlawful debt collection as described above.

109.   At the very latest, Apple had notice of the illegality of the Social Casino Enterprise as of the Ninth Circuit's 2018 holding in *Kater*. Apple's post-*Kater* participation in the Social Casino Enterprise demonstrates its commitment to upholding and operating the structure of the Social Casino Enterprise.

110.    As a result of Apple's conduct, Plaintiffs and Members of the Class were deprived of money and property that they would not otherwise have lost.

111.    Under 18 U.S.C. § 1964(c), the Class is entitled to treble their damages, plus interest, costs, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

Plaintiffs Donald Nelson and Cheree Bibbs, individually and on behalf of all others similarly situated, respectfully request that this Court enter an Order:

a)    Certifying this case as a class action on behalf of the Class defined above, appointing Donald Nelson and Cheree Bibbs as representatives of the Class, and appointing their counsel as Class Counsel;

b)    Declaring that Defendant's conduct, as set out above, is unlawful under the UCL;

c)    Declaring that Defendant's conduct, as set out above, constitutes racketeering activities, collection of unlawful debts, and conspiracy to engage in the same;

d)    Entering judgment against Defendant Apple, in the amount of the losses suffered by Plaintiffs and each member of the Class;

e)    Enjoining Defendant from continuing the challenged conduct;

f)    Awarding damages to Plaintiffs and the Class members in an amount to be determined at trial, including trebling as appropriate;

g)    Awarding restitution to Plaintiffs and Class members in an amount to be determined at trial,

h)    Requiring disgorgement of all of Apple's ill-gotten gains;

i)    Awarding reasonable attorneys' fees and expenses;

j)    Awarding pre- and post-judgment interest, to the extent allowable;

k)    Requiring injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs and the Class; and

l)    Awarding such other and further relief as equity and justice require, including all forms of relief provided for under the UCL and RICO.

1

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully Submitted,

**DONALD NELSON and CHEREE BIBBS**,
individually and on behalf of all others similarly
situated,

Dated: January 22, 2021          By:  /s/ Todd Logan
                                      *One of Plaintiffs' Attorneys*

Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
Todd Logan (SBN 305912)
tlogan@edelson.com
Brandt Silver-Korn (SBN 323530)
bsilverkorn@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300 / Fax: 415.373.9435

*Counsel for Plaintiffs and the Proposed Class*